IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

SHIN H. KANG,

    Petitioner,

    v.                  CIVIL NO.: WDQ-08-2446

NANCY ROUSE, *et al.*,

    Respondents.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

MEMORANDUM OPINION

Pending is Shin H. Kang's[1] petition for writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions in the Circuit Court for Montgomery County, Maryland. No evidentiary hearing is necessary. Local Rule 105.6 (Md. 2010). For the following reasons, the petition will be denied.

I.    Background

From November 17 to 20, 2003, Kang was tried by the court (Debelius, J.); he was found guilty of first- and second-degree assault, and acquitted of attempted first- and second-degree murder. At trial, Mrs. Jin Kang testified that Kang physically abused her during their marriage. Kang was represented at trial by attorney Michael L. Subin. The Court of Special Appeals summarized the evidence:

> According to Mrs. Kang, in the early hours of February 8, 2003, after an evening of arguing about the suspected infidelity, Mr. Kang ordered his wife to write out a suicide note as he dictated it. He then escorted her to the basement of their home, where he compelled her to stand on a stool as he tied a nylon rope around her neck. She testified that she was compliant because she

---

[1] Kang is confined at the Roxbury Correction Institution; Warden Gregg Hershberger is Kang's custodian and will be substituted for Nancy Rouse as Respondent. *See* Rule 2(a), 28 U.S.C. folio § 2254; Fed. R. Civ. P. 25(d)(1).

thought her husband was trying to humiliate and frighten her, and she knew from experience that resistance could lead to additional physical abuse. She saw her husband kick the stool out from under her feet. As her body dropped and the rope tightened around her neck, she saw her husband walking away before she passed out.

Mrs. Kang testified that when she regained consciousness, she found her husband hovering over her, begging her forgiveness. He carried her upstairs to a bedroom and rubbed Vaseline on her neck. He did not call for medical or other assistance on the morning of the hanging.

Two days later, Mr. Kang took his wife to see Dr. Daniel Kim. Mr. Kang did virtually all of the talking to the doctor. Mrs. Kang wore a scarf around her neck to conceal her wounds that were caused by the rope. The hanging was not mentioned. Instead, Mr. Kang told Dr. Kim that Mrs. Kang had fallen and sustained an injury to her body. Mr. Kang also told Dr. Kim that Mrs. Kang had been depressed over the recent death of her father.

When the Kangs returned to Dr. Kim on February 19, 2003, they drove in separate cars because Mr. Kang intended to go straight to work after the visit. Mr. Kang again assumed the role of principal spokesperson. During this second visit, Mr. Kang told Dr. Kim that Mrs. Kang had sustained serious injuries to her neck while she was visiting her family in Korea. Mrs. Kang did not initially contradict her husband's statement to Dr. Kim. After the Kangs departed, however, Mrs. Kang waited until she was certain that Mr. Kang had driven away, and she then returned to Dr. Kim's office. She told Dr. Kim her version of what actually happened to her neck. Dr. Kim advised her to seek outside help.

After she left Dr. Kim's office on February 19, she went to meet with Samuel Lee, a pastor at her church. She showed him her neck, and told him about the incident that caused her injury. Pastor Lee advised her to call the police if she had additional problems with her husband. While Mrs. Kang was meeting with Pastor Lee, her cellular phone rang several times, but she declined to answer the phone because she could see that the calls were from her husband.

Mrs. Kang went home after the meeting with her pastor. Mr. Kang arrived soon thereafter. He seemed angry, and he directed her to accompany him to the upstairs bedroom. Before going upstairs, Mrs. Kang whispered to her teenage daughter to call the police if Mrs. Kang screamed.

When the Kangs were alone upstairs, Mr. Kang pushed his wife several

times. She screamed. Within minutes, police officers responded to the daughter's telephone call.

The police officers separated the Kangs, and Mrs. Kang told the police officers of the hanging incident. After Mrs. Kang stated that Mr. Kang had threatened to shoot her and the children, the police asked Mr. Kang whether there were any weapons in the house. Mr. Kang acknowledged that he had in fact purchased a 380 automatic handgun on February 10, 2003 and had taken possession of the gun and brought the gun home on February 19, 2003.

*Kang v. State*, 163 Md. App. 38, 45 (2005); Ex. 13 at 2–5.

On July 28, 2004, Kang was sentenced to a 15-year term for first-degree assault and a suspended five-year term for the second-degree assault.

On direct appeal, Kang raised four issues:

(1) Did the trial court fail to insure that the jury waiver was knowing and voluntary?

(2) Did the trial court err in admitting evidence of prior consistent statements?

(3) Did the trial court violate *Blakely v. Washington*?

(4) Did the trial court err in denying credit for time served in pretrial home detention?

Exs.10, 13.[2]

The Court of Special Appeals granted Kang credit for time served in pretrial home detention and affirmed his convictions.

On appeal to the Court of Appeals, Kang raised two issues:

(1) Did the Court of Special Appeals err in ruling that the jury trial waiver was "knowing and voluntary" under Maryland Rule 4-246(b), where the record showed that: the waiver inquiry was not translated from English to Mr. Kang's native language of Korean; and the waiver colloquy contained absolutely no inquiry as to voluntariness?

---

[2] Exhibits hereinafter refer to Respondents' Exhibits at Paper No. 8.

(2) Did the Court of Special Appeals err in ruling that a continuing objection made twice by defense counsel did not preserve an issue for appeal because the trial judge did not expressly "grant" the continuing objection?

Ex. 14.

The State filed a conditional cross-petition to review "whether the Court of Special Appeals failed to properly address Kang's failure to preserve his question for appeal as to whether the trial court properly accepted his waiver of a jury trial where the waiver proceeding was not translated verbatim into Korean." Ex. 15. The Court of Appeals rejected Kang's claims of error and affirmed his convictions.[3] Ex. 20. Kang did not seek certiorari to the Supreme Court.

On October 6, 2006, Kang filed a petition for post-conviction relief in the Circuit Court for Montgomery County, claiming:

(1) his jury waiver was defective;

(2) ineffective assistance of trial counsel for:

    (a) failing to adequately investigate the case;

    (b) failing to permit him to make a knowing and voluntary election between a court trial and a jury trial and by advising him to elect a court trial;

    (c) referring to the "Wheel of Violence" in opening statement;

    (d) failing to object to expert testimony on domestic violence;

    (e) failing to conduct meaningful cross-examination of the victim;

    (f) failing to object to testimony that the victim was telling the truth;

    (g) failing to object to prior bad acts testimony;

---

[3] Chief Judge Bell and Judge Greene dissented. Ex. 20.

(h) failing to object properly to prior consistent statements of the victim;

(i) failing to object to prejudicial hearsay evidence; and

(j) the cumulative effect of these errors.

Exs. 1, 21.

At the post-conviction hearing on March 22, 2007, Kang and trial counsel Subin testified. On April 24, 2007, the court denied post-conviction relief; the court's order was filed on May 11, 2007. Exs. 23–25.

Kang sought leave to appeal the denial of post-conviction relief, asking: (1) did the post-conviction court use erroneous legal standards in determining that counsel was not ineffective in advising Kang between his options of a court or jury trial; (2) did the post-conviction court err in determining that trial counsel was not ineffective for failing to object to bad acts evidence; and (3) did the post-conviction court err in ruling that trial counsel was not ineffective in failing to object properly to the admission of the victim's prior consistent statements. Ex. 26. On October 23, 2007, the Court of Special Appeals summarily denied leave to appeal.

II.    Analysis

A.  Standard of Review

The federal habeas statute, 28 U.S.C. § 2254, provides a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).[4]  Ineffective assistance claims are reviewed under a two-part test

---

[4] A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

established in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Bell v. Cone*, 535 U.S. 695, 698–99 (2002) (explaining the interplay between *Strickland* and 28 U.S.C. § 2254(d)).[5]

B.  Kang's Claims

Here, Kang claims: (1) his jury trial waiver was not knowing, intelligent, and voluntary; and (2) trial counsel provided ineffective assistance in failing to: (a) permit him to make a knowing, voluntary, and intelligent election between a court and jury trial, and in advising him to elect a court trial; (b) object to prior bad acts evidence; and (c) object properly to prior consistent statements of Mrs. Kang.

1.  Jury Trial Waiver

---

"[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly."  *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010).  The state court's application of Supreme Court precedent must be "objectively unreasonable."  *Id.*  This "highly deferential standard . . . demands that state-court decisions be given the benefit of the doubt."  *Id.*  A state court's factual determination is unreasonable under § 2254(d)(2) when it is more than merely incorrect or erroneous.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2006).  It must be sufficiently against the weight of the evidence that it is objectively unreasonable. "[F]ederal habeas courts [have] no license to redetermine credibility of witnesses[.]" *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *see also Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008).

[5] To establish ineffective assistance of counsel, it must be shown that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at  687.  Representation is deficient if it falls below "an objective standard of reasonableness."  *Id.* at 688.  Counsel's performance must have been outside "the range of competence demanded of attorneys in criminal cases."  *Id.* at 687 (citation and internal quotation marks omitted).  The review of competence is "highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The petitioner must overcome the presumption that the challenged action was "sound trial strategy."  *Id.*

Prejudice requires that (1) counsel's errors deprived the defendant of a fair trial whose result is reliable, and (2)  it is probable that, but for counsel's errors, the result would have been different.  *See id.* at 690–94.  A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *See id.* at 697.  A petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner. *See Bell*, 535 U.S. at 698–99; *Williams*, 529 U.S. at 405.

Kang asserts that the determination that he was not denied his right to a jury trial under the Sixth and Fourteenth Amendments is contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent and was unreasonable in light of the evidence. Kang asserts that he is a native of Korea who has difficulty understanding English, and his jury trial rights were not translated into Korean. Pet. at 16. Kang acknowledges that a translator was present in court and duly sworn when the waiver was made. *Id.*

Kang asserts that he failed to understand the rights he was waiving. *Id.* at 17. Kang contends that the trial judge knew of his difficulty with English[6] and should have probed more deeply into Kang's understanding of the rights he was waiving. Kang asserts that although he was informed in English that a jury consists of 12 persons from the community whose verdict must be unanimous, he was not informed that the jury would have been required to find him guilty beyond a reasonable doubt. Thus, his jury trial waiver was not "knowing." *Id.* at 19. He also asserts that the waiver was defective because no inquiry was made to establish voluntariness. *Id.*

Several days before the waiver hearing, Kang signed a written waiver of his right to a jury trial. Ex. 23 at 75–78; Ex. 24 at 20–22. Just before opening arguments, the following jury waiver colloquy was:

> Mr. Subin: Your honor, the only other issue that I had was that I just wanted to put on the record that Mr. Kang has agreed with the waiver

---

[6] For example, at the suppression hearing over which the trial judge presided, Mr. Kang testified that he understood "simple things" in English, but could not understand a question on cross-examination, "you know, some are very high-class thing." Ex. 3 at 29. Also, Mr. Kang brought his brother-in-law to the suppression hearing and when he met with his trial attorney "[b]ecause he understands English better than I do." *Id.* at 33. Kang testified at trial that he went to Korean doctors because "the English is insufficient; and I've never actually gone to American doctors. I mean, I feel more comfortable." Ex. 7 at 42.

of the jury trial.

THE COURT:    All right.  Let me just voir dire Mr. Kang in that regard.

Q.       Mr. Kang, you have an absolute right to a trial by jury in this matter. You also have the right to choose a trial by a judge. In this case, it would be myself.

Do you understand that if you had a trial by a jury, there would be 12 men and women chosen from the community and your attorney would be able to participate in the selection of that jury[, which] would decide your guilt or innocen[ce] of the charges?

Do you understand that?

A.       Yes.

Q.       Do you understand that if you had a trial by a jury, before you could be convicted by a jury, all 12 jurors would have to unanimously agree upon your guilt? Just for the record, do you understand that?

A.       Yes, I understand.

Q.       And just be [sic] way of example, if you had a jury trial and 11 jurors wanted to convict and one juror did not, you would not be convicted.  Do you understand that?

A.       Yes.

Q.       And is it your decision to waive the jury trial and elect to have a trial before me today in this court?

A.       Yes.

THE COURT: Very well.  I am satisfied that Mr. Kang has knowingly and voluntarily waived his right to trial by a jury.

Ex. 4 at 8–9.

a.   Decision of the Court of Special Appeals

Kang's direct challenge to his jury trial waiver was rejected by the Court of Special

Appeals of Maryland:

A defendant's right to a jury trial is protected by both the U.S. and Maryland Constitutions. *See* U.S. Const. amend. VI (applying to the states under the Fourteenth Amendment); Md. Const. Declaration of Rights articles 5, 21, and 24. A defendant, however, may choose to waive the right to a jury trial and instead be tried by the court. *See* Md. Rule 4-246(a) ("In the circuit court a defendant having a right to trial by jury shall be tried by a jury unless the right is waived pursuant to section (b) of this Rule."). Maryland Rule 4-246(b) sets forth the procedure for waiving a jury trial in a criminal proceeding:

> A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily.

As we have continued to recognize, ultimately, to waive properly this constitutionally protected right the "trial judge must be satisfied that there has been an intentional relinquishment or abandonment of a known right or privilege." *Smith v. State*, 375 Md. 365, 379, 825 A.2d 1055, 1064 (2003) (Citations omitted). The waiver examination depends upon the facts and circumstances of each case. *State v. Hall*, 321 Md. 178, 182, 582 A.2d 507, 509 (1990) (Citations omitted). "[T]he questioner need not recite any fixed incantation" when evaluating whether the defendant knowingly and voluntarily waived his or her right to a jury trial. *Martinez v. State*, 309 Md. 124, 134, 522 A.2d 950, 955 (1987). "The court must, however, satisfy itself that the waiver is not a product of duress or coercion and further that the defendant has some knowledge of the jury trial right before being allowed to waive it." *Hall*, 321 Md. at 182, 582 A.2d at 509 (citing *Martinez*, 309 Md. at 134, 522 A.2d at 955).

\*\*\*

Kang argues that his jury trial waiver was not valid as it was not knowing or voluntary. Initially, Kang iterates that his waiver was not voluntary because the trial court made no specific inquiry to establish the voluntariness of the jury trial waiver. This claim is unavailing.

In *Dortch v. State*, 290 Md. 229, 235, 428 A.2d 1220, 1224 (1981), we determined that the trial judge was not required to inquire specifically as to whether the jury trial waivers of two defendants were induced by promises or by physical or mental coercion. . . . We stated additionally

that "no specific ritual or fixed litany need be followed by the trial judge in determining the voluntariness of the accused's election to waive his right to a jury trial." *Dortch*, 290 Md. at 235, 428 A.2d at 1223-24. Nonetheless, while not required, "many trial judges do direct such an inquiry to defendants who waive jury trials under Rule 735 and we think this is the preferable practice." *Dortch*, 290 Md. at 236, 428 A.2d at 1224.

In *Martinez v. State, supra*, 309 Md. at 134-35, 522 A.2d at 955 . . . we concluded that the "transcript of the waiver hearing simply d[id] not support the trial court's conclusion that the appellant voluntarily waived his right to a jury trial." The waiver hearing inquiry exposed that, while the defendant felt he was not presently suffering from any physical illness, he currently was taking medication to treat schizophrenia, paranoia, and possibly other psychiatric and psychological conditions. *Martinez*, 309 Md. at 127–28, 522 A.2d at 952. . . . Noting as "particularly relevant" the defendant's affirmative response to the question as to whether the waiver decision was induced or coerced, we determined that the trial judge could not ignore the response and the record did not support the notion that the defendant, under those circumstances, voluntarily waived his right to a jury trial. *Martinez*, 309 Md. at 135, 522 A.2d at 955.

In *State v. Hall, supra*, 321 Md. at 183, 582 A.2d at 510, we determined that, based on the record before the trial court, the judge could be satisfied fairly that the defendant knowingly and voluntarily waived his right to a jury trial, as required under Maryland Rule 4-246. We highlighted the fact that the trial court did not ask explicitly the defendant whether he understood what he had been told or whether his election was the result of any physical or mental duress or coercion. *Id*. This Court, nonetheless, concluded that the waiver was knowing and voluntary. In doing so, we emphasized that, in addition to waiving his right in open court following an exchange with the court, the defendant "on two prior occasions, the first in writing, and the second during in-court plea negotiations, [ ] also waived his right to a jury trial; on each occasion, he was also represented by counsel." *Id*. . . . . Based on the "totality of the circumstances," we determined that the defendant's waiver was knowing and voluntary. *Hall*, 321 Md. at 183, 582 A.2d at 509.

Most recently, in *Abeokuto v. State*, 391 Md. 289, 324, 893 A.2d 1018, 1038 (2006), a majority of the Court held that the defendant knowingly and voluntarily waived his right to trial by jury for the guilt/innocence phase of a capital proceeding. We emphasized again that the "trial court is not required to engage in a fixed litany or boilerplate colloquy with a defendant." *Abeokuto*, 391 Md. at 320, 893 A.2d at 1036. We noted also that "[n]o facts from the record demonstrate[d] that the court had reason to

ask [the defendant] whether he had been coerced or threatened to waive his right to a jury trial or whether anyone, including defense counsel or the prosecutor, promised [the defendant] anything in exchange for his waiver." *Abeokuto*, 391 Md. at 320-21, 893 A.2d at 1036. While we noted that the record might raise the need for specific consideration of voluntariness because the defendant's mental health was an issue before trial (ultimately resolved in favor of competency) and that the defendant may have been taking a prescription medication prescribed while incarcerated pre-trial, the trial judge, immediately before conducting the jury waiver inquiry, heard testimony on the defendant's mental and medication states. *Abeokuto*, 391 Md. at 321, 893 A.2d at 1036.Therefore, we concluded that because those matters had been inquired into immediately prior to the waiver inquiry, "questions directed to those areas were not required in this case" during the waiver colloquy, there having been both an adequate and contemporary consideration of that information. *Id.*

Ex. 20 at 6–13.

   b.   Decision of the Court of Appeals

The Court of Appeals considered the voluntariness of the jury trial waiver and

rejected the claim:

> As the cases, *supra*, recognize, there is no specific ritual or fixed litany required of trial judges in assessing the voluntariness of defendants' jury trial waiver. We therefore begin our analysis with the premise that there is no uniform requirement explicitly to ask a defendant whether his or her waiver decision was induced or coerced, unless there appears some factual trigger on the record, which brings into legitimate question voluntariness. In contrast to the circumstances in *Martinez*, Kang's colloquy responses did not trigger a requirement that the trial judge inquire further as to voluntariness.

*Id.* at 13.

Maryland's highest court next considered whether the waiver was knowing:

> Kang argues additionally that his jury trial waiver was not knowing because the trial judge (1) did not "make any efforts to ascertain whether Kang understood the nature of the rights he was waiving" and (2) the trial judge "did not make sure that the proceedings were translated from English to Korean." Kang's arguments on this ground shall fail as well.

. . . Rule 4-246(b) provides that the trial judge must be satisfied only that the defendant possesses knowledge to fulfill the "more flexible 'knowingly'" requirement. *State v. Bell*, 351 Md. 709, 720, 720 A.2d 311, 316-17 (1998). As we stated, *supra*, as to voluntariness, the questioner is not required to engage in a fixed litany to assess whether a defendant's jury trial waiver is knowing. The contours of the required examination depend upon the facts and circumstances of each case.

In *Tibbs v. State*, 323 Md. 28, 31, 590 A.2d 550, 551 (1991), we held that the "record [wa]s woefully deficient to establish that [the defendant] knowingly and voluntarily relinquished his right to a jury trial."
. . . .

While the inquiry in the present case is not clothed in the finest cashmere, the colloquy conducted by the trial judge is certainly not a "naked" inquiry as in *Tibbs*. It more than adequately demonstrates that Kang possessed "some knowledge" of his right to a jury trial. *See Bell*, 351 Md. at 727, 720 A.2d at 320 (Citations omitted). The "byte-sized" questions asked by the trial judge in the present case included a colloquy as to the fundamentals of a jury trial, including that the defendant possessed the right to a trial by a judge or jury; a jury consists of 12 individuals who are chosen from the defendant's peers; and a jury's decision must be unanimous and, thus, all 12 must be in agreement (the trial judge described an example of unanimity). *See Abeokuto*, 391 Md. at 350 n. 23, 893 A.2d at 1054 n. 23 (noting the preference during the waiver colloquy of jury sentencing rights to present the defendant with information in small, intellectual "bytes" and then inquire discretely after each "byte" whether he or she understands). Kang responded that he understood each of these questions . . . . Thus, we conclude the substance of the colloquy conducted by the trial judge was adequate in informing Kang and ascertaining his awareness of his fundamental jury rights.

Next, Kang argues that the trial judge should have ensured functionally and on the record that the waiver proceedings were translated for him from English to Korean. Prior to the preliminary hearings, Kang filed a request with the court to appoint a Korean-English languages interpreter. Subsequently, at the start of the first day of the trial proceedings, a Korean-English interpreter was present and duly sworn. Moments later, the trial judge voir dired Kang in English regarding his jury trial waiver. Following that, after a brief statement from by court, the State gave its opening statement:

[PROSECUTOR]: Your Honor, can I just–I note for the record

that I couldn't help but notice that I haven't heard any translation.

[DEFENSE COUNSEL]: I was about to ask the Court's indulgence, Your Honor. The translator was writing everything down while it was going on and we are going to ask that he repeat it.

THE COURT: I guess that is somewhat unusual. I certainly want Mr. Kang to have the benefit of a translation but is there a reason why—

[DEFENSE COUNSEL]: Mr. Kang understand[s] English fairly well and we just wanted to make sure he was getting all of the pieces while that was going on.

THE INTERPRETER: Your Honor, may I?

THE COURT: Sure.

THE INTERPRETER: Mr. Kang specifically asked me to translate the things that he feel[s] that he did not understand prior to the opening of the trial.
\* \* \*
THE COURT: So, just so I am clear on it. Are you only translating certain things if Mr. Kang indicates he doesn't understand?

THE INTERPRETER: That is correct, your Honor.

This Court recognizes the presumption that the actions of a trial court are correct and the party claiming error bears the burden of rebutting that presumption. . . . .

Kang contends that the prosecutor's statement ("Your Honor, can I just–I note for the record that I couldn't help but notice that I haven't heard any translation.") indicates that the jury waiver colloquy was not translated for him into Korean, and because the record does not conclusively show that the voir dire was translated, Kang did not understand the rights he was waiving. As the Court of Special Appeals also noted, *Kang*, 163 Md. App. at 29, 877 A.2d at 177, trial transcripts rarely indicate whether dialogue is being translated simultaneously. As a result of the prosecutor's statement following the State's opening argument, however, the trial judge engaged in the following exchange

with Kang to ensure his satisfaction with the translation services of the interpreter:

> [PROSECUTOR]: . . . [Defense Counsel] had indicated that his client is satisfied.

> [DEFENSE COUNSEL]: Yes, Your Honor. While [the court was] recessed, I spoke to [the interpreter] and my client and my client is very satisfied that [this interpreter] can do the job. There apparently had been some problems in the past with other interpreters.

> [This interpreter] was not one of them and my client is prepared to be voir dired by Your Honor just to make sure that the State's concerns and my concerns are covered and that he is confident with [the interpreter].

> THE COURT: Very well. Mr. Kang, let me ask you. It is critically important that you understand everything that is said at this time and that you be able to fully participate in this trial whether that involves discussing matters with your counsel, understanding the testimony or testifying at this trial if you choose to do that.

> What I want to do is I want to be absolutely sure that you are satisfied with the services of [this interpreter] as the interpreter and that you are comfortable with your ability to communicate with him and understand through him what has been said at this trial.

> Have you had an opportunity to discuss this matter with [the interpreter] this morning?

> THE DEFENDANT: Yes.

> THE COURT: Are you satisfied with [this interpreter's] services as an interpreter?

> THE DEFENDANT: I am satisfied.

> THE COURT: Are you satisfied with [this interpreter] serving as the interpreter that you will be able to understand what is being said by others and will be able to communicate fully with your counsel and with the Court?

THE DEFENDANT: Yes.

THE COURT: [Interpreter], I need to have you then state what it is that Mr. Kang is saying. The problem I am having is I know that Mr. Kang has some English skills and is able to communicate to some extent in English, but just to be consistent, I am going to either need to have you or Mr. Kang answer one or two questions.

THE INTERPRETER: Yes, your Honor.

THE COURT: When you said, yes, Mr. Kang understands that and is satisfied[,] is that what I understand?

THE DEFENDANT:  Yes.

THE COURT: All right. Very well. [Defense counsel], are you satisfied at this point that we can proceed and have your client be able to fully participate in this trial and understand what is being said?

[DEFENSE COUNSEL]: Yes, I am, your Honor.

THE COURT: Very well. Now, at this point, the only thing we have done is we have proceeded with an opening statement by the State and at that point I understand that Mr. Kang was having that statement translated for him by [the interpreter]. Has Mr. Kang now had that opening statement translated to his satisfaction so that we can proceed or do you need some time to go over that with him?

THE DEFENDANT: I understood all.

    Kang continued to indicate his satisfaction with the quality and quantity of translation throughout the trial. The following exchange occurred immediately after the last question during the defense's cross-examination of Caroline Kang, the defendant's daughter, on the second day of trial:

[PROSECUTOR]: Your Honor, I actually didn't notice, but [my co-counsel] did–I have a situation where the translator is not translating again.

THE COURT: Well, I had understood that, based on our colloquy yesterday, that [the interpreter] and Mr. Kang were both satisfied that there was sufficient translation for him to understand whatever was taking place in the proceeding.

[THE INTERPRETER]: Sure, I did ask him again. He specifically asked me not to. He understood, he understands. That's what he tells me.

THE COURT: All right. That was [the interpreter's] response, just for the record. Mr. Kang, let me just ask you, are you satisfied that you understand what is being said in the proceedings at this time?

MR. KANG: Yes, I am satisfied.

THE COURT: All right, very well.

In fact, as the Court of Special Appeals also noted, *Kang*, 163 Md.App.at 34, 877 A.2d at 179–80, during the hearing on post-trial motions, Kang's attorney expressly waived simultaneous translation:

THE COURT: Just back up for a second, you know, I[ ] notice[d] our interpreter is not interpreting.

* * *

THE COURT: Well, [Defense Counsel], why don't you have a brief discussion with our interpreter and make sure you all—

[DEFENSE COUNSEL]: I think this [issue] came up at trial too.

Could we have a husher for a few minutes?

THE COURT: Sure.

* * *

[DEFENSE COUNSEL]: Your Honor, we had a discussion with our client and if there's something he thinks he doesn't understand, [at] some point he's going to ask the interpreter to clarify . . . .

THE COURT: I just want to make sure, [Defense Counsel], you're satisfied—

16

[DEFENSE COUNSEL]: I am satisfied.

THE COURT: —that your client has the opportunity—

[DEFENSE COUNSEL]: We are.

THE COURT: —to understand or participate—

[DEFENSE COUNSEL]: Yes, your Honor.

THE COURT: —to the full extent that he wishes to in this hearing, all right? Go ahead.

The record also shows that Kang demonstrated his ability to converse in English. As the Court of Special Appeals noted, Kang, 163 Md. App. at 33, 877 A.2d at 179, Kang had been an employee of the U.S. Postal Service for 17 and 1/2 years; Kang proclaimed that he spoke English "[w]ell[,]" but "not very well;" Kang's attorney described to the court that "Mr. Kang understand[s] English fairly well . . . ;" and, in fact, during trial, Kang answered some of the State's questions during cross-examination using English. Even when Kang apparently encountered language difficulties, the record demonstrates that Kang continued to be satisfied with the translation from his interpreter. Thus, the record is persuasive that the jury trial waiver was likely not the result of language deficiency; we conclude Kang's waiver was knowing.

We find no requirement of simultaneous, word-for-word translation, whether on or off the record. . . . . Thus, given the varying comprehension levels of defendants for whom English may be a second language and the intricacies of interpreting different languages, at this juncture, we shall not proclaim a single bright-line rule requiring simultaneous, word-for-word translation in all cases in which an interpreter is appointed. In the present case, we are satisfied that Kang had an opportunity to understand and participate in his criminal proceedings. Moreover, every indication is that Kang did just that.

Accordingly, we conclude that the trial judge, based on this record, reasonably could be satisfied that Kang knowingly and voluntarily waived his right to a jury trial.

Ex. 20 at 13–22 (footnotes omitted unless indicated otherwise).[7]

---

[7] In footnotes, the Court of Appeals observed that the transcript does not specify whether the answers were spoken by Kang or by the interpreter on behalf of Kang. Ex. 20 at 12 n.3.

The right to a trial by jury must "be jealously preserved," and the defendant's consent to waiver must be express and intelligent.[8]  Courts must determine the validity of waivers not "as a mere matter of rote but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from [jury trials] or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity."  *Patton*, 281 U.S. at 312–13.

In this case, the Court of Appeals appropriately considered whether Kang had waived his right to a jury trial voluntarily, knowingly and intelligently.  It concluded that Kang

---

Further, the Court of Appeals noted that five days before trial, Kang, through his counsel, filed a Motion to Waive Jury Trial.  Then, immediately before trial, defense counsel indicated that Kang had agreed to waive jury trial:

> As the Court of Special Appeals noted in its opinion, *Kang*, 163 Md.App. at 36, 877 A.2d at 181, this Court has recognized the presumption that criminal defendants who are represented by counsel have been informed of their constitutional rights. *See, e.g.*, *Bell*, 351 Md. at 727, 720 A.2d at 320 (Citations omitted); *Thanos v. State*, 330 Md. 77, 91, 622 A.2d 727, 733 (1993) (Citations omitted); *Gilliam v. State*, 320 Md.637, 652, 579 A.2d 744, 751 (1990) (Citation omitted). *But see Abeokuto v. State*, 391 Md. 289, 348 n.21, 893 A.2d 1018, 1052 n.21 (2006) (noting that the presence of an attorney will not mitigate an inaccurate or incomplete court advisement of a jury sentencing right).

Ex. 20 at 15 n.4.

[8] *See Patton v. United States*, 281 U.S. 276, 312 (1930), *overruled on other grounds by Williams v. Florida*, 229 U.S. 78, 92 (1970); *see also Adams v. United States*, 317 U.S. 269, 271 (1942) ("[A]n accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury . . . .  There is nothing in the Constitution to prevent an accused from choosing to have his fate tried before a judge without a jury . . . .").  In order for a waiver "to be valid under the Due Process Clause, it must be 'an intentional relinquishment or abandonment of a known right or privilege.'" *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

understood the proceedings, and his jury trial waiver was not the product of a language deficiency.

The state court's finding that Kang demonstrated sufficient ability to communicate in English so as to understand the jury waiver is supported in the record.[9] Kang responded appropriately to the trial judge's queries during the waiver colloquy. Kang told the court that he was satisfied with the translation. His counsel also told the court that Kang understood English fairly well. Further, Kang knew that a translator was present during the waiver colloquy. Neither Mr. Kang nor his counsel sought translation. As Kang had had an interpreter at his pre-trial hearings, he knew that he could request the interpreter's assistance. As the Court of Appeals observed, the trial transcript also shows that Kang replied to some of the State's questions during cross-examination in English.[10] Kang had lived in the United States for 23 years and had been employed by the U.S. Postal Service for almost 18 years when he was arrested. Ex. 23 at 83. He had submitted a written waiver of a jury trial days before the inquiry in open court.[11] Ex. 23 at 136–37.

The determination of the state courts is entitled to deference. The state court's findings are accorded a presumption of correctness and are supported in the record. The state court's

---

[9] The Court of Appeals concluded that the trial judge was able to observe Kang's demeanor, tone and facial expressions as he responded during the waiver colloquy. *See* Ex. 20 at 12. This Court concurs.

[10] *See, e.g.*, Ex. 7 at 66–67.

[11] Rule 23(a) of the Federal Rules of Criminal Procedure states three requirements for waiving a jury trial: "1) the defendant waives a jury trial in writing; 2) the government consents; and 3) the court approves." Fed. R. Crim. P. 23(a). All the Constitution requires is a knowing, voluntary, and intelligent waiver. *See United States v. Boynes*, 515 F. 3d 284, 286 (4th Cir. 2008). Maryland requires a waiver inquiry on the record in open court. *See* Md. R. 4-246.

determination was neither contrary to, nor an unreasonable application of, clearly established federal rights.

2. Ineffective Assistance of Counsel

a. Jury Trial Waiver

Kang also contends that trial counsel was ineffective for failing to insure that his jury trial waiver was knowing and voluntary. Kang says the decision to waive his right to a jury trial was "thrust upon him on the eve of trial" and its significance was not explained. Pet. at 23. Kang claims that the post-conviction court ignored "whether trial counsel overstepped his role in the matter of a jury trial waiver and whether this was violative of Petitioner's right to effective counsel." *Id*. at 25. Kang asserts that waiving a jury trial is not simply a matter of trial tactics, but rather a decision "personal" to the defendant, and the decision is a basis for post-conviction relief under *Strickland*. *Id*. He argues that the post-conviction court improperly relied on *Tucker v. Warden*, 243 Md. 331 (1966). Pet. at 24.

At the post-conviction hearing, Kang's trial counsel Subin testified that he met with Kang before trial "two dozen times," not including their telephone conversations. Ex. 23 at 152–53, 118. Initially, Kang and Subin met alone. Later, at Subin's suggestion, Kang was accompanied by his brother-in-law, Mr. Cha.[12] Mr. Cha attended, in part to convey to Kang "subtleties in language that need to be explained." *Id*. at 119. All conversations were conducted in English.

Subin testified that he did not have any difficulty communicating with Kang. *Id*. at 153. Subin testified that he and Kang continuously discussed whether to choose a jury or bench trial

---

[12] Mr. Cha (Young Don Cha) is also called "Mr. Chung" by the post-conviction court. *See* Ex. 23.

and the significance of each decision. *Id.* at 123–24, 157. Subin explained to Kang that a bench trial would take some of the emotion out of the trial. *Id*. at 123–24. Subin told the post-conviction court that he consulted with very experienced trial counsel to inform his recommendation to Kang. About two weeks before the motions hearing, Subin recommended a bench trial. *Id.* at.132, 159–60. Subin testified, "I waited, I gave him several days to consider this and consider his choice and what I was advising but made very clear to him that this was his choice. And I would[,] whether I felt one way or the other, weakly or strongly . . . abide by his wishes." *Id*. at 137. On November 11, 2003, Kang signed a letter waiver of jury trial witnessed by his brother-in-law, Mr. Cha. *Id*. at 136–37.

The post-conviction court found that Subin had explained the consequences of the waiver, and Kang's waiver was knowing and voluntary:

> [T]he petitioner alleges that his counsel failed to allow him to make a knowing, voluntarily, and intelligent election between a Court and jury trial. The Court of Appeals has made a legal determination that when the petitioner appeared before Judge Debelius at the beginning of his trial, he made a knowing, voluntary, and intelligent waiver of his right to a jury trial. Petitioner's counsel acknowledges that the waiver has been determined to be valid, pursuant to Rule 4-246. However, he asks this Court to go beyond the four corners of the waiver colloquy in open court, and find that the petitioner was one, coerced into the waiver by his attorney; two, did not understand his right to a jury trial; three, that it was his attorney's choice and not his own choice to have a court trial; and four, that there was a reasonable probability that the recommendation for a Court trial and a waiver of a jury trial changed the outcome of the case.
>
>   . . . The petitioner admits that he signed a letter prepared by his attorney, Mr. Subin. However, he claims he had to leave work hurriedly to come over to sign the letter and then rush back to work. He says he was given little explanation by Mr. Subin, paid cursory attention to it, signed it, and left. Mr. Subin indicates that he had been discussing the issue of taking a court trial for a couple of weeks . . . .

There is no evidence that the petitioner didn't have every opportunity to review the letter, or to take it with him before signing it, or discuss the matter in greater detail with Mr. Chung (phonetic sp.), his confidant. The petitioner, Mr. Kang, acknowledged that Mr. Subin told him that by taking a court trial the emotion would be removed. . . .

. . . [T]he Court finds that the petitioner voluntarily signed the letter. And this Court further finds that the petitioner had every opportunity to read, and digest the letter, and discuss it with Mr. Subin. Furthermore, Mr. Chung and the petitioner admit that they had a meeting with Mr. Subin on Sunday before the trial, November 16th, which was two days after signing the letter at Mr. Subin's office, according to the respondent.

And I emphasize, neither one of them brought up the issue of the selection of a court trial when they met with Mr. Subin on the eve of the trial, which was Sunday before the trial at Mr. Subin's office. Had they had any reservations, concerns, or misunderstandings, about not having a jury trial, it is reasonable to conclude that at the Sunday meeting they would have demanded the opportunity to discuss it.

In the waiver letter of November the 11, 2003, State's Exhibit 1, the petitioner not only waived a jury trial, selected a court trial, but also affirms in that letter that he trusts his attorney and understands his attorney's recommendation. And I emphasize recommendation as opposed to decision, to give up his right to a jury trial. The letter which the petitioner signed says, "I agree to waive my right to a jury trial and have a judge of the Circuit Court try the case."

. . . The Court finds that it was not only permissible for Mr. Subin to make a recommendation as to the type of trial, but that it might very well have been ineffective assistance of counsel had he not made a recommendation.

Furthermore, during Judge Debelius's inquiry, the petitioner had every opportunity to protest and state it wasn't his decision to waive a jury trial, but that it was his attorney's. Neither the petitioner nor Mr. Chung testified that Mr. Subin threatened or forced them to make the decision. If the decision was Mr. Subin's rather than the petitioner, the petitioner was given every opportunity before Judge Debelius to address the issue. The petitioner chose not to, and this Court concludes that he freely and voluntarily waived his right to a jury trial.

I don't find that Mr. Subin's conversing with the petitioner in English caused any communications problems. The petitioner came to the United

States in 1984. Worked for the Postal Service for 18 years. Conversed with Mr. Subin in English. Conversed with Mr. Chung in English. In fact, helped his wife and business by making calls for her in English. And was examined by a doctor in English. The Court finds that the petitioner's concern about whether or not to have a jury trial is without merit. And is an afterthought by the petitioner, and is an attempt to avoid serving his 15-year sentence.

Ex. 24 at 19–23. The post-conviction court's determination that Kang's waiver was informed and voluntary is supported by the record and is a proper application of Supreme Court precedent.

The post-conviction court next considered and rejected the claim that Subin's recommendation to proceed with a bench trial instead of a jury trial constituted ineffective assistance:

> The second asset -- aspect to be resolved under the waiver of the jury trial issue is whether or not Mr. Subin's recommendation to have a court trial was ineffective assistance of counsel. *Tucker v. Warden Maryland Penitentiary*, 243 Md. 331, at 331 (1966), held, "The decision to submit to a trial by the Court rather than a jury is one of tactics. And the selection of one, rather than another, is not grounds for post-conviction relief." This should be the end of discussion, however I'll address the issue.

> The petitioner's assertion that he would have had a greater chance of acquittal with a jury trial is conclusory. This Court draws no such conclusion from the facts in the record. The petitioner's attorney argues that most, if not all, attorneys would go with a jury trial, given that set of facts. There -- however, there is no evidence to support that claim. I cannot take judicial notice of that. However, I do agree with the petitioner that by selecting a court trial, the petitioner gave up his opportunity to have a hung trial, and that there would be a greater likelihood of a reversal on appeal had there been a jury trial.

> If one's main goal is to hope for an error to seek remand or reversal that [sic] a jury trial would be mandated in every case. That logic would suggest that counsel's recommendation for a court trial would always be deemed ineffective assistance of counsel. Declaring recommendations of court trials by lawyers, per se ineffective assistance of counsel, would be however contrary to *Tucker v. Warden Penitentiary*.

Although this Court agrees with the petitioner's counsel that an attorney must always be, "looking down the road," that is appellate issues, his primary focus should be on acquittal on all or at least on the major counts. Furthermore, the petitioner presents no statistics or findings as to the percentage of hung juries in attempted murder cases.

Now, let's analyze Mr. Subin's recommendations for a court trial. Mr. Subin admittedly was a trial attorney with no jury trial experience. Mr. Subin testified that he discussed the issue of trial selection with several experienced trial attorneys, one of which was a public defender and one of which, later, was appointed to the Circuit Court. Discussing the matter with other experienced trial attorneys was a proper and appropriate way to arrive at a recommendation. Mr. Subin concluded that by electing a court trial the emotional factor would be removed from the case.

I find that was a realistic expectation and consideration. The outcome of the trial must be considered, the outcome of the case, the trial must be considered in evaluating Mr. Subin's judgment. . . .

Now, let's take a look at outcome. As the petitioner states on page 15 of his petition, Mr. Kang was facing a possible life sentence on the charges of attempted first degree murder. Further, the case against him hinged on the words, on his word versus that of his wife's. The indictment confirms what the petitioner was facing and a look at the transcript and Judge Debelius' summation verifies that this was truly a situation of credibility between the husband and wife.

Had this been a jury trial . . . the petitioner could have easily been convicted of attempted first degree murder.

However, the petitioner was acquitted of attempted first and second degree murder and convicted of first and second degree assaults. The Court is aware that Judge Debelius did go outside the guidelines on the first and second degree assault. However, the petitioner could have received a life sentence or many more years than 15, had he been convicted of attempted first degree murder.

I find that a trial judge is much better equipped to separate the technical differences between attempted murder and first degree assault. That is, the Court would not allow emotion to enter into its verdict. Also -- also, the jury could have developed a tremendous dislike for the petitioner, because of all of his prior abuses and his actions after the hanging. Not only after they would have found he attempted to hang his wife, he never took her to a hospital. Never called 911 to determine the extent of her injuries. And, in

fact, he berated her verbally for doing something so stupid in the fact that they had children.

    The event occurred on February 8, 2003, and the petitioner didn't actually take his wife to even get any medical attention until the 10th of February. By his own admission, he lied to the doctor when he did take her to a doctor. The only first-aid he applied was putting some salve on her neck to cover, I guess, the ligatures.

    Furthermore, it would be reasonable to assume that if his wife had really attempted to commit suicide, he would have called 911 immediately and tried to get her psychiatric help. Then on top of everything else, the evidence shows that 11 days later the wife testified that on February 19th, the petitioner pushed her to the floor in her bed and their 11-year-old daughter called the police.

    Judge Debelius must have found that when the petitioner kicked out the chair from beneath his wife as she was tied up, that he never intended to actually kill her, but merely inflict serious injury. That distinction could have easily been missed or rejected by a jury. The test is not what most other lawyers might have done, but whether or not it was ineffective assistance of counsel to cho[o]se a court trial over a jury trial.

    I find that the petitioner had a favorable result, especially considering the fact that Judge Debelius did not believe his story. I find no reason to believe a jury would have believed his story either. . . . Sanitizing the case of emotion made sense, therefore I find that the petitioner failed to overcome the presumption that the recommendation to elect a court trial under these circumstances was a sound trial strategy.

Ex. 24 at 23–28.

The post-conviction court's determination withstands scrutiny. The post-conviction court's decision, which is supported by the record, is clear: Subin recommended to his client that he elect a bench trial. In making this recommendation, Subin explained his reasoning to Kang. But, the actual decision whether to waive the right to a jury trial remained "personal" to Kang, and Subin was ready to proceed with a jury trial if Kang so decided.

Reviewing the ineffective assistance claim under *Strickland*, Ex. 24 at 7, the state post-conviction court found Subin's recommendation to proceed to a judge trial reasonable in light of the probable emotional testimony of Mrs. Kang and her young daughter. Further, the post-conviction found Kang was unable to sustain his burden to show prejudice. The post-conviction court noted that Kang faced attempted murder charges, and a trial judge was better able to differentiate between attempted murder and first-degree assault, especially given the highly emotional testimony. The state-court adjudication was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor is it based on an unreasonable determination of facts in light of the evidence.

    b. Failure to Object to Prior Bad Acts Testimony

Kang faults trial counsel for failing to object to "numerous instances of bad acts evidence, which are presumptively inadmissible" under Maryland law. Pet. at 26. In rejecting this claim, the state post-conviction court held:

> Clearly Mr. Subin should have objected to the admission of evidence of prior bad acts on the part of the petitioner. His objections should have been automatic responses without the need for reflection. Prior acts such as these ones in this case should always be objected to. However, under the authority of Rule 5-404(b), I find that those prior bad acts would have been admissible to prove motive and intent.
>
> Furthermore, there was no evidence presented at the post-conviction hearing that any of those prior bad acts didn't take place. The petitioner apparently didn't deny these prior bad acts. I find that the evidence was extremely relevant to the case. When the charges [are] that a man has attempted to kill his wife, motive and intent are the essence of relevancy. And I find that the probative value outweigh[s] the prejudice in this case. Revelation of prior abuse during their marriage was relevant to the analysis of the suicide note, and an understanding of the calm demeanor of the victim as she was marched to what she thought was her execution.

> The petitioner raises a couple of other objections. The petitioner points out that Mr. Subin failed to object to testimony regarding prior child abuse of his children. I find that that testimony also fits under the exceptions of Rule 5-404(b). Judge Debelius said, "What I do believe is this, I think that Mr. Kang is a very angry man. Not only was he fighting with his wife, he was mean to his children, and . . . he would have the predisposition, the intent, and the motive to commit the offense. Nothing in his family life seemed to make him happy or content." This confirms that those prior bad acts proved to Judge Debelius that the petitioner had a motive and intended to harm his wife.

Ex. 24 at 13–14.

Kang predicates this claim solely on the state post-conviction court's application of state law. When conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also Cagle v. Branker*, 520 F. 3d 320, 324 (4th Cir. 2008). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68.

The bad acts testimony was admissible under Maryland law to prove motive and intent. As the evidence was admissible under state law, the failure to object was not prejudicial and the state post-conviction ruling was not an unreasonable application of *Strickland*.

    c.   Failing to Object Properly to the Victim's Prior Consistent Statements

Kang claims trial counsel was ineffective because the continuing objection did not preserve the issue for appeal. Kang reasons that had the objection been made properly, it is probable that the conviction would have been reversed.

At trial, Mrs. Kang testified that Kang placed a noose around her neck and attempted to hang her. On cross-examination, Subin did not reference Mrs. Kang's pretrial inconsistent statements.

Subsequent witnesses called by the prosecution adduced evidence of Mrs. Kang's prior consistent testimony. Subin made a continuing objection on hearsay grounds.

The post-conviction court considered and rejected this claim:

> Number seven, the petitioner alleges that counsel was ineffective in failing to object to prior consistent statements of the victim. So, I ruled on that last one that even if he had objected, the evidence would have come in, and therefore wouldn't have changed the outcome of the case.

> Number seven, the petitioner alleges that counsel was ineffective in failing to object to prior consistent statements of the victim. Mr. Subin's cross examination of Mrs. Kang clearly implied that she fabricated her story. That the petitioner tried to kill her. The petitioner's defense theory was that Mrs. Kang attempted suicide and the defendant/petitioner heroically saved her. Rule 5-802.1(b), as interpreted by *Holmes v. State*, 350 Md. 412 (1998), requires the statements to proceed the alleged fabrication, improper influence, or motive. I find that a motive to fabricate by Mrs. Kang took place on the date of the suicide/murder which was February 8th of 2003. All of the consistent statements the State offered were made after that date. Therefore, I conclude that these prior consistent statements were not admissible under 802.1(b).

> However, under *Holmes v. State*, I find that the statements were admissible under 5-616(c)(2). Had Mr. Subin had a proper continuing objection under Rule 4-323(b), I find Judge Debelius would have overruled all continuing objections to prior consistent statements by Mrs. Kang, just as he did on November 18, 2003, page 77, lines 12 and 13, and lines 23 and 24 when Samuel Lee (phonetic sp.) was testifying. I don't know which exception to the rule Judge Debelius used, because he didn't officially state, but I do find that Rule 5-616(c)(2) was the correct one.

> I also find that those statements were relevant. I don't find that the Court's reference to statements on November 20, 2003, at page 154, lines 18 to 25, and page 55, lines 1 and 2, indicated that Judge Debelius had accepted them as substantive evidence. I find that he was accepting them for rehabilitative purposes. The petitioner's theory was that Mrs. Kang attempted suicide. I don't find that Mr. Subin properly making a continuing objection would have changed the admissibility of the evidence. In other words, I believe it was proper for rehabilitative purposes.

Furthermore, had all the other prior consistent statements been excluded, I don't find the outcome of the case would have changed. If we look at Judge Debelius's comments on November 20, 2003, starting at page . . . 153, line 2, "What I do believe is this", quoting Judge Debelius, "I think that Mr. Kang is a very angry man. There's, there's good and there's bad in everybody." You're going to page, line 11, "I find his testimony fantastic at points," emphasis added by this Court.

"Where [there was] inconsistent testimony about the lights being off, but him observing Mrs. Kang's face being purple and her tongue being out, and then he turned the lights on. And first there was some vagueness as to whether the lights were on and then it was a light behind him, or not the light where Mrs. Kang was. And then the testimony that Mrs. Kang was in the dark room with the door closed."

And then on page 154, line 11, "The testimony with regard to Mr. Kang placing his wife . . . on the bench and telling her to wait there while he didn't know whether she was conscious or not, although there was some vagueness there at first, the testimony suggested that he believed her to be conscious. If she was hanging from her neck by a rope, how he could possibly place her on a bench is fantastic. There's also testimony that confirms Mrs. Kang's version of what happened. She told her pastor what happened and he made a very credible witness.

"She went to Dr. Kim's office and told Dr. Kim what had happened. Something she was afraid to do in front of her husband. And I find her husband's presence at the doctor's visits and speaking on her behalf to the doctor, to be one more element of control."

One second. At 156, line 6 to 20, "What do I really believe? I think Mr. Kang is a very disturbed man. I think that it served me as not beyond the pale to believe that his intent was to kill Mrs. Kang. What I do believe, really, I believe that he did intend to kill Mrs. Kang, but legally the question is, am I convinced of that beyond a reasonable doubt. And I have wrestled with that. I think Mr. Kang was disturbed, angry, jealous, resentful. I think he was wrestling within himself, with his own feelings and his own intention. I believe that when he placed her on that stool, he could well have intended that that be the place of her death. But I can't say that I'm convinced of that beyond a reasonable doubt."

This language from Judge Debelius in his summation convinces this Court that had the prior consistent statements not come in, that the outcome would not have been different. Specifically the petitioner alleges that Mr. Subin should have objected to a witness Kung Ali's (phonetic sp.)

> testimony that Mrs. Kang came to stay with her three years before the incident, because she had a fight with her husband. The record reveals that Mr. Subin did object to that line of questioning on several occasions.
>
> What more could a lawyer do? His effectiveness for post-conviction relief purposes, can't be judged by whether or not the objection is sustained. Regardless, I find that the evidence was admissible as a prior bad act under 5-404(b).

Ex. 24 at 14–18.

The decision of the state post-conviction court is supported in the record and constitutes a reasonable application of Supreme Court precedent to the facts. The record shows that Subin repeatedly attempted to impeach and discredit Mrs. Kang during cross-examination. Ex. 4 at 107–49; Ex. 5 at 4–11. The post-conviction court determined that Kang had not been prejudiced by counsel's performance in light of the other evidence adduced at trial. The determination of the state court is entitled to deference and will not be disturbed.

Whether Mrs. Kang's prior consistent statements were admissible at trial is a matter of state evidentiary law. A federal habeas review is limited to "deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68; no federal law was implicated by the admission of this testimony.

## C. Certificate of Appealability

The court finds that Kang is not entitled to a certificate of appealability ("COA"). A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). To make such a showing, the defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  When a district court dismisses a habeas petition solely on procedural grounds, a COA will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack*, 529 U.S. at 484).  Petitioner has not made the requisite showing in these circumstances.  Denial of a COA does not prevent petitioner from seeking permission to file a successive petition or pursuing his claims upon receipt of such permission.

III.    Conclusion

        For the reasons stated above, Kang's petition will be denied.

September 23, 2010                                    _____/s/_____
Date                                                 William D. Quarles, Jr.
                                                     United States District Judge